## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| MICHELLE NELSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SUI COMMUNITIES, INC., GARY A. SCHIFFMAN, JOHN BANDINI MCLAREN, KAREN J. DEARING, and FERNANDO CASTRO-CARATINI,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Michelle Nelson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by her counsel, which included, inter alia: (a) review and analysis of relevant filings made by Sun Communities, Inc. ("SUI" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of SUI's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.       This is a federal securities class action on behalf of all investors who purchased or otherwise acquired SUI securities between February 28, 2019 and September 24, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.       Defendants provided investors with material information concerning SUI's accounting practices and internal control over financial reporting. Defendants' statements included, among other things, confidence in SUI's brand, calling the Company "industry leading" and repeatedly touting strong performance years. Moreover, Defendants consistently publicly reported financial results, outlooks, and guidance to investors, all while engaging in insider trading and concealing undisclosed loans and a $4 million mortgage. This scheme compromised the independence of SUI's Board, the Compensation Committee, and the Audit Committee, while calling into question the integrity of the Company's governance, controls, and financial disclosures.

3.       Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning where money was coming from, namely, undisclosed loans and a $4 million mortgage. Importantly, Defendants concealed key information regarding Board members' insider trading, loans taken on behalf of SUI by CEO Shiffman, and the mortgage signed by CEO Shiffman on behalf of an entity called DH Bingham Farms LLC.  Such statements absent these material facts caused Plaintiff and other shareholders to purchase SUI's securities at artificially inflated prices.

4.       On September 24, 2024, after market close, the truth emerged when Blue Orca published a report detailing that SUI's CEO Shiffman received an undisclosed $4 million mortgage

2

from the family of independent SUI Board member Brian Hermelin. Importantly, Blue Orca reports that Hermelin who has been Chair of the Compensation Committee and a member of the Audit Committee since 2015, is also a stepcousin of CEO Shiffman and their families reportedly have a "close-knit bond." Additionally, the report finds that CEO Shiffman has borrowed money from Arthur Weiss, a SUI Board member and partner of law firm that serves as SUI's General Counsel, according to the Company's 10-K. In a deposition conducted on March 28, 2023, CEO Shiffman acknowledged that he and Weiss have "had a relationship over 35 years where we've loaned each other money." Critically, Weiss paid the doctor implicated in a life insurance fraud scheme $700,000 on behalf of Shiffman. Blue Orca's report called into the question the integrity of SUI's Board and the integrity of the Company's governance, controls, and financial disclosures.

5.      Investors and analysts reacted immediately to SUI's revelation. The price of SUI's common stock declined dramatically. From a closing market price of $139.10 per share on September 24, 2024, SUI's stock price fell to a low of $137.48 per share on September 25, 2024.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant SUI is headquartered in this District and a significant portion of its

business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased SUI common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in SUI is attached hereto.

12.     Sun Communities, Inc. is a corporation organized under the laws of Michigan, with a principal place of business located at 27777 Franklin Road, Suite 200, Southfield, Michigan 48034. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "SUI."

13.     Defendant Gary A. Shiffman ("Shiffman") was, at all relevant times, the Chief Executive Officer and Chairman of SUI.

14.     Defendant John Bandini McLaren ("McLaren") was, at all relevant times, the Chief Operations Officer and President of SUI.

15.     Defendant Karen J. Dearing ("Dearing") was the Chief Financial Officer, Executive Vice President, Treasurer, and Secretary of SUI until May 2, 2022. Dearing began serving as Executive Vice President of Special Projects on May 2, 2022.

16.     Defendant Fernando Castro-Caratini ("Castro-Caratini") was Chief Financial Officer beginning on May 2, 2022.

17.     Defendants Shiffman, McLaren, Dearing, and Castro-Caratini are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SUI reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     SUI is liable for the acts of its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to SUI under respondeat superior and agency principles.

## **SUBSTANTIVE ALLEGATIONS**

### *Company Background*

21.     SUI is a real estate investment company that focuses its investments on manufactured housing communities, recreational vehicle communities, and marinas. SUI was established in 1975 and became a publicly owned corporation in December 1993.

5

### _Defendants Failed to Disclose that CEO Shiffman Received an Undisclosed_
### _$4 Million Mortgage from the Family of the Compensation Committee Chair_

#### _February 28, 2019_

22.    DH Bingham Farms LLC took out a $3.95 million mortgage from David B. Hermelin Trust and Doreen Hermelin Trust, jointly on February 28, 2019. According to the Oakland County, Michigan Clerk/Register of Deeds Office, DH Bingham Farms LLC was registered under the name of CEO Shiffman two days earlier, and he is the signatory for the entity on the mortgage, as illustrated below:



23.    Upon information and belief, David and Doreen Hermelin, whose names are on the trusts that provided the loan, are the parents of independent SUI Director Brian Hermelin.

24.    Brian Hermelin has served on SUI's Board of Directors since January 1, 2014 and currently serves as the Chair of the Compensation Committee. Moreover, he is specifically cited as an independent Director, in spite of his undisclosed relationship with and financial ties to SUI CEO Shiffman.

25.    The above-mentioned transaction qualified as a related-party transaction but was not disclosed as such by SUI in any SEC filings.

**_The Defendants Materially Misled Investors Concerning_**
**_SUI's Accounting Practices and Internal Control Over Financial Reporting_**

_February 19, 2020_

26.     On February 19, 2020, Defendants issued a press release and held a corresponding

earnings call detailing their FY2019 results. On the call, CEO Shiffman reported on SUI's positive

results stating, in relevant part:

> During 2019, Sun continued with its track record of delivering industry-leading
> results for its shareholders. We generated same-community NOI growth of 7.3%,
> added nearly 2,700 revenue-producing sites and delivered annual core FFO per
> share growth of 7.4%.

27.     The same day, SUI published a Form 8-K press release showcasing fourth quarter

and fully year 2019 results and 2020 guidance. In pertinent part:

> For the quarter ended December 31, 2019, total revenues increased $27.8 million,
> or 10.2 percent, to $301.8 million compared to $274.0 million for the same period
> in 2018. Net income attributable to common stockholders was $28.5 million, or
> $0.31 per diluted common share, for the quarter ended December 31, 2019, as
> compared to net income attributable to common stockholders of $9.0 million, or
> $0.11 per diluted common share, for the same period in 2018.

> For the year ended December 31, 2019, total revenues increased $137.2 million,
> or 12.2 percent, to $1.3 billion compared to $1.1 billion for the same period
> in 2018. Net income attributable to common stockholders was $160.3 million, or
> $1.80 per diluted common share, for the year ended December 31, 2019, as
> compared to net income attributable to common stockholders of $105.5 million, or
> $1.29 per diluted common share, for the same period in 2018.

28.     As part of the press release, CEO Shiffman released a statement highlighting SUI's

2019 accomplishments and touted the Company as "industry leading", in relevant part:

> Sun Communities again delivered industry leading growth as we successfully
> executed on our strategic initiatives and saw strong results across the business. Our
> organic growth has been a consistent earnings driver as we benefit from sustained
> consumer demand for our high-quality, affordable homes and RV vacation
> destinations. Capital deployment during 2019 of over $1.2 billion in accretive
> acquisitions, expansions, and ground up development provide incremental growth
> opportunities for the years ahead. In recognition of an outstanding year and a solid

7

future, the Board of Directors for the fourth consecutive year approved an increase in our quarterly dividend. We are proud of our accomplishments and our team and remain committed to delivering superior value to our shareholders.

*February 17, 2021*

29.     On February 17, 2021, Defendants issued a subsequent press release detailing their FY2020 results. On the corresponding earnings call, CEO Shiffman touted SUI's growth for the year stating, in pertinent part:

> As we reflect on the events of 2020, we are pleased with our performance and the demonstrated resilience and stability of our business and operating platform, particularly in light of the challenging environment. We generated 4.0 percent same community NOI growth, delivered 3.5 percent year over year Core FFO per Share growth, deployed $3.0 billion into accretive acquisitions and raised approximately $1.9 billion in two equity offerings with strong investor demand. We are well positioned to continue delivering industry leading growth and have a new business line that broadens our opportunity set with the addition of Safe Harbor Marinas.

30.     In an accompanying Earnings Call, CEO Shiffman further paraded SUI's growth despite hardships the Company faced due to COVID-19-related shelter-in-place orders. In relevant part:

> Sun generated core FFO per share growth of 3.5%. Same Community NOI growth of 4% added over 2,500 revenue-producing sites and achieved total portfolio occupancy of 97.3%, a 90 basis point improvement over 2019. To drive additional future growth, we acquired almost $3 billion of properties in 2020.
>
> …
>
> As we reflect on the events of 2020 and look optimistically to the future, we are encouraged by the fundamentals of our business. The demand for high-quality, affordable housing and vacationing is as strong as ever. Even with the various shelter-in-place restrictions throughout 2020 and into 2021, applications to live in a Sun community remain at an all-time high as we received almost 50,000 applications in 2020 and sold nearly 2,900 homes.

31.    Later, CFO Dearing provided guidance to investors as part of the Company's prepared remarks, in pertinent part:

> Turning to guidance. For the year, we expect core FFO to be in the range of $5.79 to $5.95 per share, an increase of 15.3% at the midpoint. First quarter FFO is expected to be in the range of $1.13 to $1.17 per share.
>
> Moving to internal growth drivers. We are anticipating a 2021 Same Community NOI growth range of 5.6% to 6.6%, which includes a blended weighted average monthly rent increase of 3.4% for manufactured housing and annual RV. Our core FFO and Same Community NOI guidance assumes lower transient RV revenue contributions in the first quarter of approximately $8 million to $10 million due to the California shelter-in-place order, which ended in early February, and the extension of the Canadian border closure.
>
> We expect revenue-producing site gains throughout the year to be between 2,150 and 2,350. On the development front, we plan to deliver 1,200 to 1,600 vacant expansion and ground-up development sites in 2021. For our marina business, we expect total NOI, inclusive of service and ancillary contributions, of $163 million to $169 million.
>
> With respect to our G&A guidance, we expect our 2021 G&A expense to be in the range of $164 million to $167 million. Approximately $33 million of the year-over-year increase is attributed to marinas as we scale that platform to capture and support the integration and operations of the large consolidation opportunity we see before us. As Safe Harbor transitions from a private operator to a wholly owned subsidiary of a public company, it requires an expanded operating infrastructure and financial reporting structure to support both its regulatory obligations, primarily around reporting, and future growth potential.

*February 21, 2022*

32.    On February 21, 2022, Defendants issued a press release and held a corresponding earnings call announcing its FY2021 results. On the call, CEO Shiffman reiterated the positive year stating, in relevant part:

> [C]ore FFO per share increased nearly 28% and Same Community NOI grew 11.2% over 2020, building further on the growth we delivered throughout the pandemic driven by high occupancy and rent increases. We added approximately 2,500 revenue-producing sites and total home sales increased nearly 43% as compared to the prior year, demonstrating the high demand to live in a Sun Community.

9

33.     CEO Shiffman released a statement as part of the press release touting SUI's "incredibly productive" 2021, in pertinent part:

> A strong fourth quarter concluded an incredibly productive year for Sun Communities, where we made meaningful progress in each of our internal and external growth initiatives. Robust demand for the attainable housing and outdoor experiences that Sun provides resulted in compelling organic growth, driving an 11.2 percent same community NOI increase for the year, further building on our demonstrated strength throughout the pandemic. We expanded our portfolio, completing $1.4 billion of high-quality acquisitions across manufactured housing communities, RV resorts and marinas and opened four new ground-up development properties. We also continued to grow our pipeline for future growth with land purchases for greenfield development and site expansions. We are particularly excited to be entering the UK market with our announced planned acquisition of Park Holidays, a leading holiday park platform with irreplaceable seaside communities. With a proven track record of execution, accretive growth and favorable tailwinds supporting ongoing demand, we are continuing to invest in our platform in order to realize additional opportunities of accelerated growth and create shareholder value for years to come.

34.     During the accompanying Earnings Call, Defendants reported on Q4 2021 and FY 2021, as well as providing guidance for FY 2022. COO McLaren shed light on the Company's four core investment strategies, in pertinent part:

> During 2021, we consistently executed on our 4 core investment strategies: first, reinvesting in our existing communities leads to steady demand and high occupancy to live in Sun's properties; second, the acquisition of accretive properties continues to add revenue and cash flow; third, expansion in our existing properties provides occupancy and revenue growth in high demand, low supply markets; and fourth, ground-up developments provide Sun with the ability to build the highest quality communities for our residents and guests while achieving high returns for our shareholders.
> This year, with our continued reinvestment in our communities, acquisition of over 50 operating properties, delivery of over 1,600 development sites and opening the first phases of 2 manufactured housing and 2 RV developments, Sun successfully executed on each of these 4 core strategic pillars.
>
> Going into 2022, we are successfully executing on our core strategies and continue the momentum to yield industry-leading growth, which could not be possible without our entire Sun team.

35.    Then, CFO Dearing reported SUI's financial results and guidance for 2022. In relevant part:

> For the fourth quarter, Sun reported core FFO per share of $1.31, 12.9% above the prior year. For the 12 months ended December 31, 2021, core FFO per share was $6.51, which was $0.01 ahead of the top end of our 2021 revised guidance and an increase of 27.9% from 2020.
>
> During 2021 and through the date of this call, Sun acquired approximately $1.5 billion of operating properties and approximately $173 million in land for our development growth initiatives. To support this growth, Sun raised approximately $2.2 billion in equity, and our operating partnership issued $1.2 billion in senior unsecured notes. This capital market activity provides us with continued capacity to pursue our growth initiatives and maintain a well-positioned balance sheet.
>
> Sun ended 2021 with $5.7 billion of debt outstanding at a 3% weighted average rate and a weighted average maturity of 8.8 years. We had $65.8 million of unrestricted cash on hand and a net debt-to-trailing 12-month recurring EBITDA ratio of 5.7x.
>
> On a pro forma basis, including our fully loaded trailing 12-month EBITDA and our forward equity issuances, our net debt-to-EBITDA would be in the mid-4x.
>
> With regard to our outlook for 2022, we expect core FFO to be in the range of $7.07 to $7.23 per share, and for the first quarter of 2022, core FFO to be in the range of $1.23 to $1.27 per share.

### *February 22, 2023*

36.    On February 22, 2023, Defendants issued a subsequent press release announcing SUI's FY2022 results. On the corresponding earnings call, CEO Shiffman declared another year of "strong performance and earnings growth" stating, in pertinent part:

> [W]e achieved a record of over 2,900 revenue-producing site gains, driven by more than 2,250 conversions of transient RV sites to annual leases, which topped last year's record conversions of nearly 1,700 sites and represented a 36% year-over-year increase.
>
> ...

This creates a very sticky customer base and gives us the ability to grow rents. The resilience of our platform can be seen in our full year total manufactured housing, RV and marina Same Property NOI results, which grew by 5.8% over 2021.

With regard to external growth, since acquiring Park Holidays in April 2022, we have focused on integration as well as being very selective in our approach to acquisitions. The U.K. market for holiday parks remains highly fragmented. And as we have done in the U.S. over the years, we have used our Park Holidays footprint to opportunistically scale our presence in the U.K. Subsequent to the Park Holidays transaction, we acquired 14 best-in-class holiday parks in the U.K. These investments have accretive going in cap rates, and we believe they will deliver significant ongoing growth and yield strong returns.

In light of current market conditions, we have shown discipline with regard to our approach to capital allocation, and we'll continue to do so going forward. As we sharpen our pencil and assess capital and funding alternatives, growing our revenue-producing sites through expansions and ground-up developments continues to offer accretive returns.

During 2022, we delivered 2,000 new expansion and greenfield development sites in North America, which was at the high end of our guidance. These new sites will begin contributing revenue in 2023 and provide a new base for growth in the coming years. We have inventory of over 16,000 fully entitled sites for development and delivery in future years, representing embedded continued growth. Additionally, we regularly evaluate our portfolio for capital recycling opportunities to enhance our long-term growth profile.

With respect to ESG, we continually identify ways that we can enhance our corporate citizenship. We recently set a target to achieve carbon neutrality by 2035 and net-zero emissions by 2045. And as previously announced, we added Jeff Blau, CEO of Related Companies, to our Board of Directors. Jeff's experience and leadership will be a tremendous addition to our team.

Lastly, our Board has raised our 2023 distribution to $3.72 per share, a 5.7% increase from the prior year. We're very pleased with our 2022 achievements. I'd like to thank all of our Sun team members who contributed extraordinary efforts to our collective success. As we look ahead to 2023, we once again expect to deliver a year of solid Same Property growth.

As our 30-year track record has demonstrated, we have a business model that delivers results throughout economic cycles, supported by compelling supply-demand fundamentals. We will remain disciplined in our investment activity, and our unparalleled expansion and development platform will continue to provide us with a differentiated growth opportunity.

37.     In the press release, CEO Shiffman issued a statement touting SUI's full-year 2022

performance, in relevant part:

> We are pleased to report another year of strong performance and earnings growth. The resilient demand for our manufactured housing, RV and marina properties, combined with the limited supply for each, are the foundations of our business model, which generates positive results throughout economic cycles. We delivered a record number of revenue producing sites in 2022, primarily driven by record conversions to annual leases at our RV communities, and we have nearly 16,200 sites in our portfolio available for development. We are optimistic in our outlook for 2023, supported by our healthy rental rate increases in our MH, annual RV and Marina properties. We will be disciplined in terms of capital deployment, pursuing selective acquisition opportunities while continuing to leverage our development platform to create new supply to meet the strong demand and deliver value for our shareholders.

38.     During the Earnings Call, CFO Castro-Caratini provided full-year 2022 financial

results and 2023 guidance, in pertinent part:

> For the year, Sun reported core FFO per diluted share of $7.35, a 12.9% increase from 2021. For the fourth quarter, we reported core FFO per diluted share of $1.33, a 1.5% increase from the prior year. Similar to last quarter, this quarter's outperformance was driven by total marina real property NOI, interest income and U.K. tax favorability.
>
> As of December 31, Sun had $7.2 billion of debt outstanding that carried a weighted average interest rate of 3.8%, with a weighted average maturity of 7.4 years. On a run rate trailing 12-month basis, our net debt-to-EBITDA ratio was 5.8x. In terms of capital markets activity, during and subsequent to quarter end, we completed a $311 million add-on to an existing secured financing with a weighted average interest rate of 4.6%. The proceeds were used to repay amounts on our revolving credit facility.
>
> In January of this year, we issued $400 million of 10-year senior unsecured notes, which benefited from $250 million of treasury locks and used those proceeds to further reduce our line of credit balance. Since we achieved an investment-grade rating in 2021, we have now issued $2.2 billion of unsecured fixed-rate notes across 4 tranches. Pro forma for this activity, our floating-rate debt was reduced to 16% of total debt, which has now decreased from 26% as of December 31, 2020.
> Turning to guidance for 2023. As summarized in yesterday's press release, we are establishing full year guidance for core FFO per share in the range of $7.22 to $7.42. We are also establishing guidance for first quarter 2023 core FFO per share in the range of $1.15 to $1.20. Note that we expect first quarter results to reflect the seasonality of U.K. operations, as outlined in our supplemental, which we acquired in April 2022.

…

The final note, increasing interest rates were a headwind on FFO growth in the back half of 2022 and continue to be a headwind in our 2023 guidance. We actively managed our interest rate risk by paying down over $700 million of variable-rate debt in the past 3 months alone, with long-term fixed-rate debt, thereby continuing to reduce our floating rate exposure. We believe our guidance reflects the current interest rate outlook at the time of this call and is informed by forward interest rate curves as of the time of providing our guidance.

Our platform of recession-resistant, best-in-class properties is positioned to continue generating strong cash flow growth for the benefit of our stakeholders. As a reminder, our guidance includes acquisitions, dispositions and capital markets activity through February 22, 2023, and the effect of a property disposition under contract expected to close in March 2023. It does not include the impact of prospective acquisitions, dispositions or capital markets activities, which may be included in research analyst estimates.

*February 20, 2024*

39.     On February 20, 2024, Defendants issued a press release and held a corresponding earnings call. On the call, CEO Shiffman highlighted SUI's "revenue growth" and "diligent expense management" stating, in relevant part:

MH same-property NOI increased by 8.6% and 6.8% and RV same-property NOI increased 9.3% and 4.8%. Same-property occupancy in MH and RV increased 230 basis points during 2023 as compared to '22. The increase was largely driven by transient to annual RV site conversions of more than 2,100 sites.

…

Despite of our year-end audit process, it was determined that the impairments should have been recognized in earlier periods, resulting in a material weakness in internal control over financial reporting. These impairments, which are now recognized at March 31, June 30 and September 30, 2023, reduced balance sheet goodwill and GAAP net income. They are noncash, and there is no impact on revenues or FFO for operational metrics.

40.     During the same call, CEO Shiffman addressed issues found during the Company's year-end audit process stating, in pertinent part:

14

[I]t was determined that the impairments should have been recognized in earlier periods, ***resulting in a material weakness in internal control over financial reporting***. These impairments, which are now recognized at March 31, June 30 and September 30, 2023, reduced balance sheet goodwill and GAAP net income.

41.     Also during the Earnings Call, CFO Castro-Caratini presented the Company's full-year 2023 financial results and 2024 guidance. In relevant part:

> For the year and the quarter, Sun reported core FFO per diluted share of $7.10 and $1.34, respectively, both of which were in line with guidance. During the year, same-property NOI grew 7.3% versus the prior year, driven by a 6.2% increase in revenue and a 4.2% increase in expenses. For the quarter, same-property NOI increased 9.6% compared to the prior year due to a 6.3% increase in revenues, driven by strong rental rate increases and occupancy gains.
> …
> Turning to guidance for 2024. For 2024, we are establishing full year guidance for core FFO per share in the range of $7.04 to $7.24. We are also establishing guidance for first quarter 2024 core FFO per share in the range of $1.14 to $1.19. For 2024, 95% of our properties are included in the same property pool, including Park Holidays.

42.     The above statements in Paragraphs 22 to 41 were false and/or materially misleading. Defendants created the false impression that they were presenting a complete and accurate picture of SUI's financial reports and accounting pertaining to the Company's projected revenue outlook and anticipated growth. At no point did Defendants state or even allude to the DH Bingham Farms LLC mortgage, signed by CEO Shiffman, or the multiple undisclosed loans CEO Shiffman received, including one from SUI Board Member Arthur Weiss. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections throughout the Class Period, which did not account for these variables.

### ***The Truth Emerges***

#### *September 24, 2024*

43.     On September 24, 2024, after market close, Blue Orca Capital published a report that SUI's CEO Shiffman received an undisclosed $4 million mortgage from the family of independent SUI Board member Brian Hermelin. Blue Orca reports that Hermelin who has been

Chair of the Compensation Committee and a member of the Audit Committee since 2015, is *also a stepcousin of CEO Shiffman and their families reportedly have a "close-knit bond."*

44.     Based on their findings, Blue Orca discovered that on February 28, 2019, an entity named "DH Bingham Farms LLC" took out a $3.95 million mortgage from David B. Hermelin Trust and Doreen Hermelin Trust, jointly. DH Bingham Farms LLC was registered under the name of SUI CEO Gary Shiffman two days earlier, and he signed for the entity on the mortgage. Further, David and Doreen Hermelin, whose names are on the trusts that provided the loan, are the parents of independent SUI Director Brian Hermelin.

45.     Additionally, the report found that CEO Shiffman borrowed money from Arthur Weiss, a SUI Board member and partner of law firm that serves as SUI's General Counsel (according to the Company's 10-K). In a deposition conducted on March 28, 2023, CEO Shiffman acknowledged that he and Weiss have "had a relationship over 35 years where we've loaned each other money."

46.     Blue Orca's investigation concluded that CEO Shiffman and his undisclosed loans from purported independent Board members greatly "compromises the independence of the Board as a whole, the Compensation Committee and, critically, the Audit Committee." It also raises "questions as to the integrity of the Company's governance, controls and financial disclosures."

47.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the press releases and associated earnings calls each February from 2020 through 2024. During the earnings calls and related statements, SUI's executives touted its success as an "industry leader" responsible for generating magnanimous growth numbers year after year by driving demand to live in Sun Communities. Furthermore, Defendants highlighted a total portfolio occupancy rate of over 97%, with CEO

Shiffman making annual statements regarding SUI's "strong performance" all while failing to disclose loans he was taking out from a SUI Board member and partner of the law firm that serves as SUI's general counsel. Additionally, while CEO Shiffman was touting SUI's success creating revenue producing sites and delivering robust annual growth, he was neglecting to disclose that he had personally signed for DH Bingham Farms LLC on a mortgage, which took out an almost $4 million mortgage from David B. Hermelin Trust and Doreen Hermelin Trust, jointly, who are the parents of independent SUI Director Brian Hermelin.

48.     Investors and analysts reacted immediately to SUI's revelation. The price of SUI's common stock declined dramatically. From a closing market price of $139.10 per share on September 24, 2024, SUI's stock price fell to $137.48 per share on September 25, 2024.

### *Loss Causation and Economic Loss*

49.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SUI's common stock and operated as a fraud or deceit on Class Period purchasers of SUI's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of SUI's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of SUI's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

50.     SUI's stock price fell in response to the corrective event on September 24, 2024, as alleged *supra*. On September 24, 2024, information emerged that was directly related to

Defendants' statements and material omissions concerning SUI's accounting and material weakness in internal control over financial reporting.

51.     In particular, on September 24, 2024, after market closed, Blue Orca released a report that SUI's CEO Shiffman received an undisclosed $4 million mortgage from the family of independent SUI Board member Brian Hermelin. Additionally, the report finds that CEO Shiffman has borrowed money from Arthur Weiss, a SUI Board member and partner of law firm that serves as SUI's General Counsel (according to the Company's 10-K). Specifically, Weiss paid the doctor implicated in a life insurance fraud scheme $700,000 on behalf of Shiffman.

52.     An analyst report published by RBC Capital Markets provided a "Not Rated" sentiment and concluded that the "only new information" in the Blue Orca report related to SUI management's historical personal conduct, which RBC states its "difficult to evaluate." The report continues to state that SUI's historical accounting and reporting issues are relevant, but well-known and that the allegations that the family of one of SUI's independent board members (Brian Hermelin, Chair of Compensation Committee and on the Audit Committee) provided a $4 million loan to SUI's CEO to buy a home from the family at a below-market valuation, should have been disclosed if true. Similarly, Blue Orca alleges that SUI's CEO was involved in a life insurance fraud scheme, but noted that the CEO has denied all wrongdoing and was not charged. Importantly, the report concludes that the allegations of undisclosed insider trading and life insurance fraud scheme were challenging to evaluate, but any insider trading should have been disclosed.

### Presumption of Reliance; Fraud-On-The-Market

53.     At all relevant times, the market for SUI's common stock was an efficient market for the following reasons, among others:

(a)     SUI's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     SUI communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     SUI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about SUI was reflected in and incorporated into the Company's stock price during the Class Period.

54.     As a result of the foregoing, the market for SUI's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in SUI's stock price. Under these circumstances, all purchasers of SUI's common stock during the Class Period suffered similar injury through their purchase of SUI's securities at artificially inflated prices, and a presumption of reliance applies.

55.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United*

*States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

57.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

58.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of SUI who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to

any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## **CLASS ACTION ALLEGATIONS**

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SUI's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SUI's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SUI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 25, 2024, there were approximately 124.7 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SUI;

    (c)     whether the Individual Defendants caused SUI to issue false and misleading financial statements during the Class Period;

    (d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    (e)     whether the prices of SUI's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    (f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SUI common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SUI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SUI's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

69.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of SUI's internal affairs.

71.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the

Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SUI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SUI's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SUI's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

72.     During the Class Period, SUI's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SUI's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SUI's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of SUI's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

73.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

75.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about SUI's misstatements.

77.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by SUI which had become materially false or misleading.

78.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SUI disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SUI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SUI's common stock.

79.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause SUI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

80.     By reason of the above conduct, SUI is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2024    Respectfully submitted,

           **SHEA LAW, PLLC**

           */s/ David J. Shea*
           David J. Shea (P41399)
           26100 American Dr., 2nd Floor
           Southfield, MI  48034
           Office.: (248) 354-0224
           Email: david.shea@shealaw.com

           Adam M. Apton
           33 Whitehall Street, 17th Floor
           New York, New York 10004
           Tel.: (212) 363-7500
           Fax: (212) 363-7171
           Email: aapton@zlk.com

           *Attorneys for Plaintiff*